## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **INTERNATIONAL TOBACCO PARTNERS, LTD.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 05-2319-KHV** |
| **PHILL KLINE, in his official capacity as** | ) | |
| **ATTORNEY GENERAL OF THE STATE** | ) | |
| **OF KANSAS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

International Tobacco Partners, Ltd., brings suit against the Attorney General of the State of

Kansas, challenging statutes relating to the Master Tobacco Settlement Agreement reached by 46

states and four major cigarette manufacturers in 1998.  Specifically, plaintiff alleges that federal law

preempts the Kansas Escrow Statute, K.S.A § 50-6a-01 et seq., as amended by the Allocable Share

Release Repealer, and the Kansas Contraband Statute, K.S.A. § 50-6a-04, because those statutes

implement an output cartel which is illegal per se under Section 1of the Sherman Act, 15 U.S.C. § 1.

Plaintiff also alleges that the state statutes violate the dormant Commerce Clause, U.S. Const. Art

1, § 8, cl. 3.[1]  This matter  comes before the Court on Defendant's Motion To Dismiss Or, In The

Alternative, Motion For Summary Judgment (Doc. #55) filed February 28, 2006 and Plaintiff's

Motion For Summary Judgment (Doc. #63) filed April 24, 2006.  For reasons set forth below, the

Court finds that defendant's motion for summary judgment should be sustained and that plaintiff's

---

[1]       Plaintiff seeks a declaratory judgment and an injunction to enjoin enforcement of the
statutes.  Plaintiff sues for itself and similarly situated tobacco importers and non-participating
manufacturers.  Because the Court finds that defendant is entitled to summary judgment on
plaintiff's claims, it does not address the class action aspects of the case.

motion should be overruled as moot.

**<u>Legal Standards</u>**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>accord</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. <u>Applied Genetics</u>, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. <u>Anderson</u>, 477 U.S. at 250-51. "In a response to a

motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith."  To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e).  Maverick Paper Co. v. Omaha Paper Co., 18 F. Supp.2d 1232, 1234-35 (D. Kan. 1998).

## II.    Facts

Except where otherwise noted, the following facts are undisputed.[2]

International Tobacco Partners, Ltd. imports and resells cigarettes which are distributed and sold in Kansas.  In the mid-1990s, a number of states brought suits against four major cigarette manufacturers to recover Medicaid and other health care costs which the states had incurred because their citizens used cigarettes.  In 1998, those defendants [Phillip Morris, Lorillard, Brown &

---

[2]       The Court omits many of plaintiff's facts because they are not proper under Rule 56, Fed. R. Civ. P.; they are legal conclusions, argument, unsupported by the record, inadmissible hearsay and/or immaterial.

Williamson and R.J. Reynolds, collectively referred to as the "Original Participating Manufacturers" or "OPMs"] agreed to a Master Settlement Agreement ("MSA").[3]  In exchange for a release from future liability, the OPMs agreed to make annual payments to the states, in perpetuity, to offset costs imposed on the states by tobacco-related diseases.[4]  See MSA § IX.

The MSA requires the OPMs to make annual per-carton payments to the settling states. MSA § IX(c)(1).  The MSA provides a "base amount" for the total OPM payment each year.  That amount (currently $8 billion) is subject to an adjustment for inflation and a "previously settled states reduction" which is currently 12.45 per cent.  If the OPMs collectively sell fewer cigarettes in the current year than they did in 1997, the base amount is reduced by approximately the percentage of the decrease.[5]  Each OPM then pays a portion of the adjusted settlement amount, based on its percentage of total OPM sales for the current year.

Four states (Mississippi, Florida, Texas and Minnesota) settled with the OPMs before the MSA.  The OPMs pay those four states (the "previously settled states") 17 per cent of the MSA per-cigarette payment amount for each cigarette sold in any state.  Thus, the OPMs pay the settling and previously settled states 104.55 per cent of the per-cigarette amount for each cigarette sold.  In 2005,

---

[3]      The District of Columbia, Puerto Rico, four United States territories and 46 states (including Kansas) signed the MSA.

[4]      The MSA restricted advertising and marketing of OPM tobacco products and required the OPMs to contribute more than $1.5 billion to fund a foundation to reduce youth smoking and educate the public about smoking-related illnesses.  See MSA § III, IV, and VI.

[5]      If the actual volume is less than the base volume, the payment is 2 per cent of the base amount plus 98 per cent of the per cigarette amount times the actual volume.  Because 2 per cent of the payment does not vary with volume, the OPM obligation declines slightly less than proportionally with volume, and the per-cigarette payment increases slightly as volume decreases. If the OPMs' actual volume exceeds the base volume, the per-cigarette rate equals exactly this amount.

OPM payments totaled about 2.2 cents per cigarette or $4.40 per carton.

The MSA allowed other cigarette manufacturers to join the agreement.  MSA § II(tt).  Subsequent participating manufacturers ("SPMs") who joined within 90 days are exempt from annual payments if they meet certain conditions.[6]  SPMs who joined after 90 days make settlement payments according to a basic formula which governs SPM per-cigarette payments.[7]  SPMs do not make payments to the previously settled states and they therefore do not receive the previously settled states reduction.  As a result, their total per-cigarette annual payment amount is 4.55 per cent less than that of the OPMs.  Id.  For 2005, the SPM payment amount was approximately 2.1 cents per cigarette or $4.20 per carton.

The MSA collectively refers to the OPMs and SPMs as the PMs ("participating

---

[6]     One condition is that the SPM sells less than its "grandfathered market share," defined as 125 per cent of its 1997 share or 100 per cent of its 1998 share.

[7]     In its fact number 23, plaintiff incorrectly claims that SPM payments are larger than OPM payments because the formula for the SPM payments involves dividing the SPM market share by the aggregate OPM market share, whereas the OPM formula involves dividing by a "larger denominator."  See Declaration of Jonathan Gruber at 9-10.  Plaintiff asserts that the Court cannot rely upon Gruber's declaration because (1) Gruber is not competent to provide an opinion on antitrust restraints; (2) his "factual statements" are actually conclusions of law; and/or (3) his opinions are based on factual errors or inadmissible hearsay.

Gruber's declaration states that he is a professor of economics at the Massachusetts Institute of Technology and a Research Associate of the National Bureau of Economic Research (Director of the Program on the Economics of Children).  Gruber served as Deputy Assistant Secretary For Economic Policy in the United States Treasury Department, where he worked on a legislative initiative to formulate comprehensive tobacco regulation.  Congress did not enact the proposed legislation, but the MSA incorporated the initiative.  Gruber served as an expert for the Department of Justice and testified as an expert witness in a case challenging the MSA on antitrust grounds, see XCaliber Int'l Ltd. v. Edmonton, No. 04-CV-9022 (N.D. Okla May 20, 2005).  He also made declarations in two other tobacco-related cases.  Gruber is clearly qualified to testify as an expert in this case.  See Daubert v. Merrill Dow Pharm., 509 U.S. 579 (1993).  The Court is capable of screening his factual statements from any legal conclusions, and disregarding any inadmissible hearsay, and it trusts that plaintiff will rectify any factual errors through contrary evidence which establishes a genuine issue of material fact.

manufacturers"). The annual payments of the PMs are allocated among the settling states according to a fixed formula. Under this formula, Kansas has an "allocable share" of .8336712 per cent.

Manufacturers who have not joined the MSA are non-participating manufacturers ("NPMs"). The NPMs do not make payments under the MSA and are not obligated to follow the MSA public health education provisions or promotion restrictions. The settling states were concerned that NPMs might not be able to pay future judgments for state health care costs related to smoking. The states also wanted to be sure that NPMs did not take advantage of their relative lower costs to expand their markets, thus increasing use of tobacco and creating higher health care costs. Therefore all 46 of the settling states, including Kansas, have enacted escrow statues in substantially identical form to a model escrow statute set forth in the MSA. See MSA Exhibit T, PXs 116-117. The model escrow statute requires NPMs to comply with the MSA public health and payment provisions. See K.S.A. § 50-6a-01 et seq. Based on their product sales in the state, the Kansas Escrow Statute requires all NPMs to make per-cigarette deposits into an escrow fund to fund future liability for tobacco related health care costs. K.S.A. § 50-6a-03(b)(1). These deposits are slightly less than the per-cigarette payments that SPMs make under the MSA. In 2005, the NPM obligation in Kansas was approximately 2.08 cents per cigarette, or $4.16 per carton.[8]

The original escrow statutes, including the Kansas Escrow Statute, provided that NPM payments would remain in escrow for 25 years, but authorized an early release of any escrow amount which was greater than the allocable share which that state would have received if the NPM

---

[8] Payments to escrow funds are not deductible for federal income tax purposes. At oral argument, plaintiff's counsel explained that escrow payments are not treated as business expenses which can be deducted under the Internal Revenue Code because the escrow payments are returned to the NPM unless the NPM is unable to pay a future judgment for tobacco-related health care costs.

had been an SPM.[9]  This "Allocable Share Release Provision" was intended to create substantial equivalence between the escrow obligation of NPMs under the escrow statutes and the amounts the NPMs would have paid if they had they joined the MSA.  See K.S.A. § 50-6a-03(b)(2)(B).  If an NPM made the bulk of its sales in a few states, however, it could obtain a refund of those escrow payments in excess of what it would have paid each of those States had it been an SPM.  For example, an NPM which made 50 per cent of its sales in Kansas (which has a relatively low allocable share) would obtain a release from its Kansas escrow fund of more than 49 per cent of its full escrow payment.  In other words, the original allocable share release provision created an unintended loophole: it only operated as intended if the NPMs distributed their products nationally. In that circumstance, the NPMs' total escrow obligations to all states with similar tobacco statutes approximately totaled the payments those NPMs would have made under the MSA.  If an NPM concentrated its sales in a few states with low allocable share percentages, however, the NPM could obtain a refund of much of its escrow payments.  Because the Kansas percentage was so low – roughly 0.8 per cent – NPMs concentrated their sales within Kansas and a few other states to receive immediate escrow refunds from those states.

To close this loophole, in late 2002, the National Association of Attorneys General ("NAAG") introduced the Allocable Share Release Repealer ("ASR Repealer"), a model statute which eliminated the ASR.  In a memo dated September 12, 2003, Attorney General William H. Sorrell of Vermont, Chairman of the NAAG Tobacco Project, underscored the urgency of "all States

---

[9]     Before the amendment, the Kansas statute provided that if an NPM established that its payments were greater than the State's "allocable share of the payments that it would have been required to make in that year under the master settlement agreement . . . had it been a participating manufacturer," the NPM was entitled to an immediate release of its over-payment.  See K.S.A. 50-6a03(b)(2)(B) (before 2005 amendment).

taking steps to deal with the proliferation of NPM sales, including enactment of complementary legislation and allocable share legislation and consideration of other measures designed to serve the interests of the States in avoiding reductions in tobacco settlement payments." PX 21 at 1-2. He stressed that "NPM sales anywhere in the country hurt all States," that NPM sales in any state reduce payments to every other State," and that "[a]ll States have an interest in reducing NPM sales in every State." Id. at 3.

In 2005, in the Allocable Share Amendment to the Kansas Escrow Statute, the Kansas legislature adopted the ASR Repealer. K.S.A. § 50-6a-03(b)(2)(B). The amendment limits releases to amounts in excess of MSA payments which the NPM would have to make as a PM, without regard to the Kansas allocable share under the MSA. Under the amendment, an NPM which concentrates sales in Kansas receives much smaller escrow releases than under the original provision.

By the middle of 2000, domestic NPMs and importers began to obtain greater market share.[10] The NAAG noted that reductions in settlement payments which result from an overall reduction in cigarette consumption benefit the states because health care costs imposed by each cigarette exceed the settlement payments.[11] On the other hand, when reductions in settlement payments occur

---

[10]    The NPMs sharply increased their share of the domestic market from 1.6 per cent in 1999 to 8.1 percent in 2003. OPM operating incomes declined substantially in 2003, but with the repeals of the allocable share release starting in 2003, their operating incomes increased. In the spring of 2004, Phillip Morris (the largest OPM) and Liggett (the largest SPM) attributed the increase of their gross profit margins to the widespread enactment of the ASR Repealers. PXs 125, 126.

[11]    The NAAG advised the settling states to enact these model Contraband Statutes promptly or receive lower MSA payments due to increased Volume Adjustments and substantial NPM Downward Adjustments. PX 21. The Volume Adjustment is determined by comparing the number of cigarettes sold nationally by OPMs in a given year with the number sold in the base year

(continued...)

8

because NPM sales displace PM sales, the states receive no benefits if the NPMs do not make escrow payments.  Therefore, in late 2000, the NAAG drafted a model Contraband Statute to ensure that NPMs made escrow payments on cigarettes.  See PX 116.  The model Contraband Statute provides that excise tax stamping agents may not stamp cigarettes for sale in the state unless the manufacturer becomes a PM under the MSA or is an NPM which makes all escrow payments required by the Escrow Statute.[12]  The model Contraband Statute imposes a criminal penalty on wholesalers who sell cigarettes made by NPMs who are not duly registered in the state and making full escrow payments.  By the middle of 2002, only seven settling states had enacted Contraband Statutes. As of today, 44 of the 46 settling states (including Kansas) have enacted these statutes.  See K.S.A. § 50-6a-04.  The Kansas Attorney General is charged with enforcing the Escrow and Contraband Statutes.

Under the MSA, the Kansas Escrow Statute (as amended by the ASR Repealer) and the Kansas Contraband Statute, each cigarette manufacturer is left to make its own unilateral decision with regard to prices and output, taking into account all of its costs and its perception of the market.  Nothing in the MSA or the Kansas statutes delegates to any person any regulatory authority or other power to dictate prices or outputs of any cigarette manufacturer.  Exhibit 3, Gruber Declaration ¶¶ 10, 42.  In calculating releases from escrow pursuant to the Allocable Share Release provision, only sales of cigarettes in Kansas are considered.  See K.S.A. § 50-6a-03(b)(2)(B) (calculating  release

---

[11](...continued)
of 1997.  The resulting percentage reduces the base payment to the states by the PMs.  The NPM Downward Adjustment can reduce a settling state's share of the MSA payments if PMs have lost market share due to participation in the MSA and the state did not diligently enforce escrow payments by NPMs.

[12]      Before the contraband statutes, the states did not have a mechanism to enforce the escrow statute.

by comparing amount NPM was required to place into escrow "based on units sold in the state of Kansas" with MSA payments the NPM "would have been required to make based on such units sold had it been a participating manufacturer"). See also Gruber Declaration ¶ 9.  The MSA payments used in the release calculation are those of an SPM, which are a per-cigarette amount determined by formulas in the MSA and do not depend on the national market share of an SPM.  Doc. 81-1 at 1-4.

Plaintiff alleges that the Kansas Escrow Statute, as amended by the ASR Repealer and the Kansas Contraband Statute, implement an output cartel created by the MSA which is illegal per se under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Plaintiff also alleges that the practical effect of the challenged Kansas statutes, together with similar statutes of other states, is to create a uniform system of regulation which results in higher cigarette prices nationwide and therefore violates the dormant Commerce Clause, U.S. Const. Art 1, § 8, cl. 3.

With regard to plaintiff's first claim, plaintiff appears to contend that a state statute which has the same effect as a per se violation of antitrust laws violates the Sherman Act.  This claim is without merit.  Parker v. Brown, 317 U.S. 341 (1943); Hoover v. Ronwin, 466 U.S. 558, 574 (1984).  Defendant, acting at the direction of the state legislature, is immune from antitrust liability.  See S & M Brands., Inc., v. Summers, 393 F. Supp.2d 604 (M.D. Tenn. 2005); Sanders v. Lockyer, 365 F. Supp.2d 1093 (N.D. Cal. 2005).  Because the challenged statutes cannot directly violate the antitrust laws, plaintiff's only possible antitrust claim is that the Sherman Act preempts Kansas law.  Defendant asserts that it is entitled to summary judgment on any such claim because the challenged statutes are not preempted.  Specifically, defendant contends that the statutes (1) neither mandate nor authorize private parties to commit a per se violation of the Sherman Antitrust Act; and (2) plaintiff cannot show that the effect of the statutes is to establish an output cartel, price-fixing

scheme or any other hybrid restraint on competition.[13]  Defendant asserts that it is also entitled to summary judgment on plaintiff's Commerce Clause claim because the challenged statutes require payments to Kansas based on sales occurring solely in Kansas and the statutes therefore place no burden on interstate commerce.

## Analysis

### I.        Sherman Act Claim

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1; Full Draw Prods. v. Easton Sports, Inc., 182 F.3d 745, 750 (10th Cir. 1999).  The Sherman Act prohibits private, not public, action.  Parker v. Brown, 317 U.S. 341 (1943).  The enactment and enforcement of a statute, as an express action of the sovereign state of Kansas, is immune from antitrust laws.  Id.  Plaintiff appears to allege that the Sherman Act preempts the Kansas statutes because (1) the Kansas statutes mandate or authorize illegal conduct – a "per se" violation; or (2) the state has delegated regulatory power over pricing or output to private entities – an impermissible "hybrid

---

[13]        In its reply, defendant also asserts that issue preclusion bars plaintiff's antitrust claim.  Defendant asserts that in Arkansas, plaintiff litigated and lost an identical antitrust preemption challenge to the amended Escrow Statute and Certification Statute.  See Int'l Tobacco Partners, Ltd. v. Beebe, 420 F. Supp.2d 989 (W.D. Ark. 2006).  Defendant asserts that Arkansas statutes at issue in Beebe were substantially identical to the statutes which plaintiff challenges in this case.  On March 6, 2006, after defendant filed its motion to dismiss or for summary judgment in this case, the United States District Court for the Western District of Arkansas granted defendant's motion to dismiss, except to the extent that the complaint challenged any retroactive application of the Escrow Statute to escrow due on sales made in the year before the passage of the amendment.  Defendant asserts that plaintiff should be precluded from relitigating in this forum the issues decided in that case.  See SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d 1507, 1520 (10th Cir. 1990) (once court has decided issue necessary to judgment, decision may preclude relitigation in a suit on different cause of action involving party to first case).  Because the Court disposes of plaintiff's antitrust claim on the merits, it need not reach the question of issue preclusion.

restraint."  Defendant asserts that it is entitled to summary judgment because (1) the challenged statutes are state action and neither mandate nor authorize private parties to commit a per se violation of the Sherman Antitrust Act; and (2) plaintiff cannot show that the statutes establish an output cartel or price-fixing scheme or any other hybrid restraint on competition.

> A.   Per Se Violation

Plaintiff apparently claims that Section 1 of the Sherman Act preempts the challenged statutes.  In determining whether the Sherman Act preempts a state statute, "the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes."  Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982).  The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute.  Id.  The state statute is proscribed only if it mandates or authorizes conduct which  necessarily violates the antitrust laws in all cases or places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.  Id.  Defendant asserts that as a matter of law, the statutes in question do not compel or permit any private party to engage in any type of anti-competitive behavior.

Plaintiff first asserts that the Escrow Statute, as amended by the ASR Repealer, has sharply reduced the competitive market position of NPMs because it requires that they make escrow payments based on a "national pot" instead of sales in particular states.  Plaintiff also asserts that because escrow payments are not deductible under federal income tax law, NPMs effectively pay more than some SPMs, thus putting them at a further competitive disadvantage.[14]  Plaintiff asserts that these measures, which raise costs for NPMs, constitute a per se violation of antitrust law.

In Xcaliber Int'l. Ltd., LLC v. Kline, No. 05-2261-JWL,  2006 WL 288705, at *4 (D. Kan.

---

[14]       Plaintiff does not address the fact that SPMs make actual payments to the states, while NPMs merely place funds in escrow and may be entitled to recover them.

Feb. 7, 2006), the Honorable John W. Lungstrum rejected plaintiff's claim that the Kansas Escrow Statute creates an output cartel which constitutes a per se violation of the Sherman Act.  See Rice, 458 U.S. at 654 ("if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed"); see also Exxon Corp. v. Governor of Md., 437 U.S. 117, 133 (1978).  This Court agrees with Judge Lungstrum that the Escrow Statute (as amended by the ASR Repealer) does not "authorize or require" any cigarette manufacturer to fix prices or limit output to prevent gaining market share. Xcaliber, 2006 WL 288705 at, *4.  The Escrow Statute (as amended by the ASR Repealer) sets certain costs for NPMs by pegging escrow  payments to the level of MSA-imposed costs.  This is unilateral state action, and PMs and other cigarette manufacturers have no control over the setting of these NPM costs.  Id.

Plaintiff also argues that the Contraband Statute is a legislated refusal to deal which requires Kansas wholesalers not to deal in products made by NPMs.  Citing Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 (1951), plaintiff argues that such boycotts are illegal per se under the Sherman Act.  Schwegmann involved a Louisiana law which required retailers to charge minimum prices that had been collusively set by distributers, and thus enforced price-making decisions by private parties.  Here, the Contraband Statute does not authorize or enforce price fixing; it merely forbids the placement of tax stamps on cigarettes which do not comply with state law.

The Court finds that as a matter of law, the Sherman Act does not preempt the challenged statutes and that defendant is entitled to summary judgment on plaintiff's per se antitrust theory.

B.    Hybrid Restraint

 Under a "hybrid restraint" theory, plaintiff argues that the Sherman Act preempts the Kansas statutes because they support an output cartel and price-fixing scheme by PMs.  Under the hybrid

13

restraint doctrine, certain restraints may be characterized as "hybrid," in that nonmarket mechanisms enforce private marketing decisions; where private actors are thus granted "a degree of private regulatory power," the regulatory scheme may be attacked under Section 1 of the Sherman Act. Fisher v. City of Berkeley, 475 U.S. 260, 267-68 (1986) (quoting Rice, 458 U.S. at 665 (Stevens, J., concurring)).[15]

Plaintiff argues that the challenged statutes are illegal hybrid restraints because of their anticompetitive effects: they effectively enforce the MSA scheme and thus change the competitive equilibrium in the cigarette market.  Plaintiff argues that the MSA penalizes increased market share through higher settlement payments for increased market share, discourages price reductions, and creates for PMs an incentive to raise prices to match increases by competitors.  See A.D. Bedell Wholesale Co. v. Phillip Morris, Inc., 263 F.3d 239, 248 (3d Cir. 2001) (overruling motion to dismiss where plaintiff alleged that statutory scheme allowed OPMs to set prices and output).[16] Defendant asserts that the record reveals no hybrid restraint because the challenged statutes do not give the PMs control of output or prices.

---

[15]     Where plaintiff establishes a hybrid restraint, action which violates the Sherman Act may still be entitled to state action immunity if a "clearly articulated" state policy is "actively supervised" by the state.  Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980).  In Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205 (2d Cir. 2004), plaintiff alleged that the MSA statutory scheme constituted a hybrid restraint and that the state did not adequately supervise the regulatory scheme.  The district court sustained defendant's motion to dismiss but the Second Circuit reversed that ruling because plaintiff alleged that state did not actively supervise the state policy.  Id. at 232.
     In this case, plaintiff also alleges that defendant does not actively supervise the conduct by the PMs and that the challenged statutes are therefore not entitled to state action immunity.  Defendant argues that plaintiff has not demonstrated an antitrust violation, and that the immunity analysis is therefore unnecessary.  As set forth in the discussion that follows, the Court agrees.

[16]     Freedom Holdings, 357 at 220 (overruling motion to dismiss because plaintiff alleged hybrid restraint and state did not adequately supervise).

In <u>Xcaliber International Ltd., LLC, v. Edmondson</u>, 2005 Lexis 26705 (N. D. Okla. May 20, 2005), the District Court for the Northern District of Oklahoma rejected a similar claim by plaintiff. The well reasoned analysis in <u>Edmondson</u> applies to this case as well.  There, the district court found no evidence that the MSA penalizes increased market share by any class of PM, which would serve to effect a market-sharing or price-fixing agreement.  It reasoned as follows:

> There is no provision in the MSA, nor any evidence in the summary judgment record, to support the claim that OPM or non-exempt SPM payments for increased market share would be in any way disproportionate to the payments they made based on the market share they had upon joining the MSA.  Although there is certainly a sharp rise in payments for exempt SPMs who exceed their grandfathered market share, the evidence in the summary judgment record indicates that the amount they pay at that point is not disproportionate when compared to the payments made all along by non-exempt SPMs, and so does not act as a penalty.  MSA, Part IX(I); Report of Jonathan Gruber.  Further [both experts agree] that as long as their marginal costs are still lower than their marginal revenues, all of these manufacturers will continue to produce regardless of changes in their relative market shares.  According to both experts, each manufacturer makes a unilateral decision as to price and output in light of the costs imposed by the MSA and its implementing legislation, including the Allocable Share Amendment.
>
> For these reasons, although the Allocable Share Amendment may be said to lessen the competitive threat of NPMs for PMs by narrowing the gap created by MSA-imposed costs, it cannot be said to serve to enforce any market-sharing or price-fixing agreement among manufacturers, or any other private decision to restrain competition.  The Allocable Share Amendment cannot be said to create or constitute either a private or a hybrid restraint.  It is therefore protected from antitrust scrutiny by the state action doctrine.

<u>Edmondson</u>, 2005 Lexis 26705, at *15-18 (some internal citations and footnotes omitted).[17]  As in

---

[17]     The court in <u>Edmonson</u> also addressed plaintiff's argument that the purpose, and perhaps even the effect, of the Allocable Share Amendment was to protect the market share of PMs and drive NPMs out of business, rather than to advance the public health and safety goals contemplated by the MSA.  It rejected that argument as a matter of law, as follows:

> [A] a state's unstated motive in enacting legislation is irrelevant.  <u>See</u> <u>City of Columbia v. Omni Outdoor Advertising, Inc.</u>, 499 U.S. 365, 379, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991) (rejecting an interpretation of the Sherman Act "that would

(continued...)

Edmondson, defendant here has presented uncontroverted expert testimony that as long as marginal costs are lower than marginal revenues, all cigarette manufacturers will continue to produce regardless of changes in relative market shares. Further, each manufacturer unilaterally decides price and output in light of the costs imposed by the MSA and its implementing legislation. For these reasons, the Court finds that defendant is entitled to summary judgment on plaintiff's claim that the Sherman Act preempts the Kansas Escrow Statute, K.S.A § 50-6a-01 et seq., as amended by ASR Repealer and the Kansas Contraband Statute, K.S.A. § 50-6a-04, because they implement an illegal output cartel.

## II. Commerce Clause Claims

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations and among the several States." U.S. Const. art. I, § 8, cl. 3. While the Commerce Clause is more frequently invoked as authority for federal legislation, the so-called dormant Commerce Clause limits state legislation which adversely effects interstate commerce. See Hughes v. Oklahoma, 441 U.S. 322, 326 (1979). A state statute may violate the dormant Commerce Clause in three ways:

> First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic

---

[17](...continued)
allow Plaintiffs to look behind the actions of state sovereigns to base their claims on 'perceived conspiracies to restrain trade'"); Hoover v. Ronwin, 466 U.S. 558, 580, 104 S. Ct. 1989, 80 L. Ed. 2d 590 (1984) (state action is "exempt from antitrust liability regardless of the State's motives in taking the action"). As long as the conduct causing anticompetitive effect is unilateral state action, taken under that state's police powers, as discussed above, it is protected from preemption by the state action doctrine.

2005 Lexis 26705, at *19.

protectionism. Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the Pike [v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)] balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured. Third, a statute will be invalid per se if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.

Freedom Holdings, 357 F.3d at 216 (internal quotations and citations omitted).

Plaintiff asserts that the challenged statutes violate the dormant Commerce Clause because the effect of such implementation is to create a uniform system of regulation which results in higher prices nationwide with resultant short-circuiting of normal pricing decisions. Second Amended Complaint (Doc. #51) at 38. In so arguing, plaintiff relies on Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 170-173 (2d Cir. 2005), where the Second Circuit held that if plaintiff could prove an interlocking web of implementing statutes which create a uniform system of regulations and result in higher cigarette prices nationwide, plaintiff would establish the third type of commerce clause violation, i.e. that the statutes have the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the states in question.[18] The Second Circuit refused to dismiss the dormant Commerce Clause claim because plaintiff alleged that the aggregate effect of the MSA and the Escrow Statutes in 31 states was to short-circuit normal pricing decisions by effectively regulating the pricing mechanism for goods in interstate commerce. Id. at 173. The Second Circuit found that to dismiss the claim at the pleading stage would be inconsistent with the

---

[18]     In Grand River, the Second Circuit noted that in Freedom Holdings it had rejected an extraterritorial-effect claim which challenged the New York Contraband Statute. The Second Circuit distinguished Freedom Holdings, however, noting that in that case plaintiffs claimed that the Contraband Statute fostered artificially high prices in New York, which inflated the prices for sales wholly outside the State of New York. See Grand River, 425 F.3d at 171, citing Freedom Holdings, 357 F.3d at 220. In Freedom Holdings the Second Circuit found that "[t]he extraterritorial effect described by appellants amounts to no more than the upstream pricing impact of a state regulation," id., and that plaintiffs had not alleged that interstate regulatory gridlock would occur if many states – or even every state – adopted similar legislation.

district court's decision not to dismiss the Sherman Act claim, which alleged that the MSA and interrelated statutes restrained trade and affected market prices.[19]  Id.

Plaintiff argues that here, it alleges that the states' Escrow and Contraband Statutes have created a "uniform system of regulation that results in higher prices nationwide," because the amount a manufacturer pays to join the MSA or as an NPM under the Escrow Statutes is tied to the manufacturer's national market share.  Id. at 171-72.  Plaintiff reasons as follows: Based on the nationwide sales by PMs as a group, a state (such as Kansas) gets an allocable share of the annual settlement under the MSA.  If PMs make more sales nationwide, each settling state gets a larger payment, and if PMs make fewer sales each settling state receives a lesser payment.  Plaintiff argues that this structure encourages PMs to raise prices nationwide so long as they do not lose significant market share.[20]

As defendant points out, any seller has an incentive to raise prices and prevent the loss of market share.  Defendant argues that from the face of the Kansas Escrow Statute, it is clear that the NPM escrow obligation in Kansas has no pricing or other impact on sales outside the state.  The Kansas Escrow Statute simply requires that an NPM which sells cigarettes in Kansas deposit into escrow a specified amount (slightly more than $0.02 in 2005) for each cigarette.  Generally, the

---

[19]     Under Rule 12(b)(6), Fed. R. Civ. P., the district court in Grand River initially dismissed both the Commerce Clause and the antitrust claims.  Subsequently, in Freedom Holdings, 357 F.3d at 226-33, the Second Circuit held that the New York Contraband Statutes were subject to federal antitrust laws and rejected defendant's argument that the state-action immunity doctrine barred plaintiff's antitrust claim.  The district court in Grand River then reinstated the Sherman Act claim, and the Second Circuit reversed its dismissal of the Commerce Clause Claim.

[20]     Plaintiff does not explain why this conclusion (PMs want to raise prices nationwide without losing market share) follows from its premise (payments to the settling states correspond to nationwide sales by PMs).  Furthermore, plaintiff does not explain why – independent of the challenged legislation – PMs would not seek to maximize both profit and market share.

funds remain in escrow for 25 years or until needed to pay a judgment or settlement in the state's favor, whichever occurs first.  K.S.A. § 50-6a-03(b)(2)(A), (C).[21]   MSA formulas determine an NPM's payment obligation if it were to join the MSA.  Although the formulas refer to national market shares, the sole effect of those references is to provide for payment of readily calculated and uniform per-cigarette amounts for each cigarette sold anywhere in the United States.  If an NPM were to join the MSA as a SPM, the base payment amount would be a fixed per-cigarette amount that in no way depends on the national market share of that NPM.  That fixed base amount is increased by the same inflation adjustment formula that appears in the Escrow Statute and is always slightly more per cigarette than the amount which the  NPMs are required to pay into escrow.  Thus, contrary to what the Second Circuit posed as a "possibility" in Grand River, the amount which an NPM is required to pay into escrow in Kansas – or any other Settling State with a similar statute – is in no way "keyed" to a "national-market-share dependent amount."  Instead, it is keyed to the MSA payment which an SPM would have been required to make on account of the cigarettes sold in Kansas.  The base SPM per-cigarette payment is always higher than the statutory per-cigarette escrow amount for NPMs.  Therefore, absent some adjustment which reduces the payment amount below the SPM base amount, the NPM escrow obligation in Kansas is determined solely on the basis

---

[21]      As a result of the ASR Repealer, a portion of the escrow funds may be released earlier under the following circumstance:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the Master Settlement Agreement payments, as determined pursuant to section IX(i) of that agreement, including after final determination of all adjustments, that such manufacturer would have been required to take on account of such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

2005 Kan. Sess. Laws 178.

of the payment amount set forth in the Escrow Statute, multiplied by the number of cigarettes which the NPM sells in Kansas.[22]  What takes place in other states has no bearing on this calculation. Therefore the Kansas Escrow Statute cannot control pricing decisions in other states.[23]

Other courts have noted the flaws in the "national payment" or "national market share" analysis in <u>Grand River</u>.  For example, in <u>Xcaliber Int'l Ltd. v. Edmondson</u>, the United States District Court for the Northern District of Oklahoma dismissed a dormant Commerce Clause claim based on the allegation that the Oklahoma Escrow Statute regulated interstate commerce:

> In its focus on Oklahoma's Allocable Share under the MSA, Xcaliber's allegation that the [ASR Repealer] forces NPMs to make a "national payment" compares apples to oranges.  The escrow payments due from NPMs selling cigarettes in Oklahoma are based only upon sales made in Oklahoma.  The Escrow Statute and [ASR Repealer] do not impose any requirement on an NPM based on sales that NPM makes in any other jurisdiction.  Oklahoma's Allocable Share of national payments made by PMs, based on their national sales and distributed among the Settling States as dictated by the MSA, has no significance in a Commerce Clause analysis of escrow payments required from NPMs based on Oklahoma cigarette sales.  Xcaliber's Commerce Clause argument does not state a claim upon which relief can

---

[22]    Potential adjustments are set forth in Section IX(i)(3) of the MSA.  These adjustments include an NPM adjustment, which would reduce the effective amount of an SPM's payment obligation for a particular year.  Such adjustments depend solely on the number of cigarettes sold in a particular state, and do not depend on national market share.

[23]    Defendant argues that the analysis does not change if conditions result in an adjustment which reduces the NPM's hypothetical payment had it been an SPM.  Those potential adjustments are set forth in Section IX(i)(3) of the MSA.  Although each is again subject to complicated formulas set forth elsewhere in the MSA, none depends on an SPM's national market share.  In fact, none of these adjustments has ever been applied for any period during which the release calculation has been governed by the current version of the Escrow Statute.  Should the conditions precedent to one or more adjustments be met in the future – for example, should there be an NPM adjustment which reduces the effective amount of an SPM's payment obligation for a particular year – the effect would simply be to reduce the per-cigarette SPM payment amount.  If the resulting per-cigarette amount turned out to be less than the per-cigarette amount an NPM originally paid into escrow on account of its Kansas sales, the NPM would be entitled to an early release under K.S.A. § 50-6a-03(b)(2)(B), but the amount would again depend solely on the number of cigarettes sold in Kansas times the new per-cigarette amount.  The prices at which the NPM sold its cigarettes in other States would not affect the NPM's per-cigarette payment in Kansas.

be granted and is dismissed.

Xcaliber Int'l Ltd, LLC v. Edmondson, No. 04-CV-0922-CVE-PJC, Slip op. at 24-25 (N.D. Okla. Apr. 5, 2005) (internal citations omitted).  Similarly, in Xcaliber Int'l Ltd. v. Ieyoub, 377 F. Supp.2d 567 (E.D. La. 2005), rev'd on other grounds sub nom, Xcaliber Int'l Ltd. v. Foti, 442 F.3d 233 (5th Cir. 2006), plaintiffs alleged that an escrow release provision discriminated against and burdened interstate commerce because it "imposes a national cost on doing business within the state."  Id. at 577.  The United States District Court for the Eastern District of Louisiana rejected that allegation, as follows:

> The amended statute imposes an escrow requirement only on units sold, which are defined in the statute as the "number of individual cigarettes sold in the state."  The statute does not impose any escrow obligation on sales occurring outside of Louisiana, nor does it impose a more onerous obligation on cigarettes imported into Louisiana from other states than it does on cigarettes that are manufactured in Louisiana and sold in this state. . . . The amended statute places no burden on interstate commerce whatsoever, requiring only that nonparticipating manufacturers pay to Louisiana a per unit sum based solely on sales occurring in this state.

Id. at 578-79 (footnote omitted).  Likewise, in this case plaintiff has not shown that the escrow payments required by the Kansas Escrow Statute either depend on or control prices charged in other states.  Defendant is entitled to summary judgment on plaintiff's Commerce Clause claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion To Dismiss Or, In The Alternative, Motion For Summary Judgment (Doc. #55) filed February 28, 2006 be and hereby is **SUSTAINED**.

21

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Summary Judgment (Doc. #63)

filed April 24, 2006 be and hereby is **OVERRULED** as moot.

Dated this 8th day of February, 2007 at Kansas City, Kansas.

s/Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

22